# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SNOW SHOE REFRACTORIES LLC, as Administrator of the SNOW SHOE BENEFICIARIES LLC PENSION PLAN FOR HOURLY EMPLOYEES, | No. 4:16-CV-02116 (Chief Judge Brann) |
| Plaintiff, | |
| v. | |
| JOHN JUMPER and AMERICAN INVESTMENT FUNDS II, a Delaware limited liability company, | |
| Defendants. | |

## MEMORANDUM OPINION

### FEBRUARY 5, 2025

## I.    PROCEDURAL BACKGROUND

In October 2018, Plaintiff Snow Shoe Refractories LLC ("SSR"), as Administrator of the Snow Shoe Refractories Hourly Pension Plan for Hourly Employees ("SSRPP"), filed a Second Amended Complaint in this action.[1] Counts I, II, and VI plead claims of Breach of Fiduciary Duty, Conversion, and Unjust Enrichment against Defendant John Jumper.[2] In October 2024, SSR filed a motion for partial summary judgment, which seeks summary judgment on all three of its

---

[1]    Second Amended Complaint, Doc. 95.

[2]    *Id.*

claims against Jumper.[3] Jumper did not file a brief in opposition. The motion is now ripe for disposition. For the reasons stated below, it is granted in full.

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[4] Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[5]

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[6] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[7] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for purposes of the motion."[8] Finally, although "the court need consider only the cited materials, . . . it may consider other

---

[3]    Motion for Partial Summary Judgment, Doc. 198.
[4]    Fed. R. Civ. P. 56(a).
[5]    *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010).
[6]    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871)).
[7]    *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).
[8]    Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).

materials in the record."[9] Additionally, Local Rule 56.1 states that "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."[10] However, Courts cannot grant summary judgment motions just because they are unopposed.[11] They must analyze the merits of the motion to determine whether "the motion and its supporting materials – including the facts considered undisputed – show that the movement is entitled to it."[12]

The Court takes judicial notice of the judgments entered against Jumper in his criminal case before this Court and in the SEC lawsuit against him, as well as Jumper's guilty plea to the criminal matter and the facts to which he admitted during his criminal sentencing. The Court has also considered Brett Blair's affidavit, pursuant to the strictures of Federal Rule of Civil Procedure 56(c): "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

---

[9]  Fed. R. Civ. P. 56(c)(3).

[10]  M.D. Pa. L.R. 56.1; *Fields v. Bureau of Prisons*, Civil Action No. 3:21-1038, 2024 U.S. Dist. LEXIS 42659, at *2 (M.D. Pa. Mar. 11, 2014).

[11]  *Anchorage Assocs. V. Virgin Islands Bd. of Tax Rev.*, 922 F.2d 168, 175 (3d Cir. 1990); *Christmann v. Link*, 532 F.Supp. 263, 275 (E.D. Pa. 2021).

[12]  Fed. R. Civ. P. 56(e)(2).

## III.    FACTUAL BACKGROUND

After Defendant Jumper helped the current principal and owner of SSR acquire it, he funneled money out of the SSRPP in three financial transactions, accomplished through a series of fraudulent documents.

### A.    Jumper's Role in Formation of SSR

At all times relevant to SSR's allegations, Jumper was a securities broker, chief executive officer and owner of a small securities brokerage firm known as Alluvion Securities, LLC, and a registered investment advisory firm, Alluvion Investments, LLC.[13] In or about 2004, Jumper approached Brett Blair, an old roommate who he had known since 1990 or 1991, and proposed that he acquire Premier Refractories, Inc., which was based in Snow Shoe, Pennsylvania, through an asset purchase agreement.[14] In February 2007, Blair closed on the acquisition of certain assets of Premier Refractories, Inc. and renamed the entity as Snow Shoe Refractories, LLC.[15] Jumper was compensated $250,000.00 for facilitating the acquisition of SSR by Blair and Brent Porterfield.[16] However, at no time was Jumper ever an officer or employee of Premier Refractories, Inc. or SSR, nor did he have any role regarding the SSRPP prior to this closing.[17]

---

[13]   Statement of Undisputed Material Facts ("SUMF"), Doc. 200 ¶4; Official Transcript, Doc. 119 at 28-29, *United States v. Jumper*, No. 4:18-cr-00128-MWB-1 (M.D. Pa. 2018) ("COP Transcript").

[14]   SUMF, Doc. 200 ¶¶3, 5; Blair Affidavit, Doc. 201-1 ¶¶2, 4.

[15]   SUMF, Doc. 200 ¶¶6-7; Blair Affidavit, Doc. 201-1 ¶4.

[16]   SUMF, Doc. 200 ¶7; Blair Affidavit, Doc. 201-1 ¶4.

[17]   SUMF, Doc. 200 ¶7; Blair Affidavit, Doc. 201-1 ¶4.

Blair is now the principal and owner of SSR.[18] In February, 2016, Blair learned for the first time that Jumper was involved in a series of fraudulent transactions regarding the SSRPP, accomplished through his forged signature on several financial documents.[19] Through Jumper's fraudulent scheme, he funneled money from the SSRPP to his own entities.

### B.    Jumper's Forgeries on Trustee Documents

First, in May 2007, Jumper forged Blair's signature on a document falsely purporting to be a resolution of the SSR board, designating Merrill Lynch Bank & Trust Co. FSB as a non-discretionary directed trustee of the Pension Plan in place of Bank of America.[20] Later that May, Jumper completed a Defined Benefit Plan Institutional Trust Account Agreement between Merrill Lynch and SSR which, despite containing Jumper's signature, was executed without SSR's knowledge or authority.[21]

In January 2008, October 2012, and March 2014, Jumper completed Merrill Lynch "Named Fiduciaries and Authorized Signatories Information" forms, falsely representing that he was "Vice President" and "V.P. Finance" of SSR.[22] Jumper

---

[18]    Blair Affidavit, Doc. 201-1 ¶1.

[19]    SUMF, Doc. 200 ¶10; Blair Affidavit, Doc. 201-1 ¶5.

[20]    SUMF, Doc. 200 ¶10; Blair Affidavit, Doc. 201-1 ¶5; Exhibit A--May 2007 Board of Directors Resolution, Doc. 200-1.

[21]    SUMF, Doc. 200 ¶11; Blair Affidavit, Doc. 201-1 ¶6; Exhibit B--May 22, 2007 Defined Benefit Plan Institutional Trust Account Agreement, Doc. 200-2.

[22]    SUMF, Doc. 200 ¶12-14; Blair Affidavit, Doc. 201-1 ¶¶7-9; Exhibit C--January 8, 2008 Named Fiduciaries and Authorized Signatories Information, Doc. 200-3; Exhibit D--October

completed a similar Bank of America "Authorized Signer Designation/ Change Form" in September 2014, also falsely representing that he was "Vice President" of SSR.[23] "Jumper was never authorized to use SSR letterhead, he was never an authorized representative of the Pension Plan, and he was never an employee, let alone a "Vice President," of SSR."[24] As a result of these fraudulent representations, "Jumper was widely viewed as Snow Shoes point of contact with Merrill Lynch" despite lacking any such authority.[25]

### C.    Jumper's Fraudulent Withdrawal of $3,000,000 From the Plan

"Jumper participated with other investors in the formation of American Investments Fund I ('AIF I') to start an air conditioner parts manufacturing business in Springdale, Arkansas called American Tubing Arkansas through the purchase of an existing business and its assets."[26]  Jumper's first fraudulent act was devised to funnel money from the Plan, through AIF I.

In February 2015, Jumper's business partner in Alluvion Investments, LLC, R. Trent Curry, incorporated an entity in Arkansas known as American Tubing Arkansas, LLC ("ATA").[27] Less than three weeks later, American Tubing, Inc.

---

26, 2012 Named Fiduciaries and Authorized Signatories Information, Doc. 200-4; Exhibit E--March 20, 2014 Named Fiduciaries and Authorized Signatories Information, Doc. 200-5.

23  SUMF, Doc. 200 ¶15; Blair Affidavit, Doc. 201-1 ¶10; Exhibit F—September 12, 2014 Authorized Signer Designation/ Change Form.

24  Blair Affidavit, Doc. 201-1 ¶12.

25  COP Transcript at 29.

26  Exhibit U—U.S. v. Jumper Indictment, Doc. 200-21 ¶12; COP Transcript at 31.

27  SUMF, Doc. 200 ¶16; Exhibit G—February 23, 2015 Arkansas American Tubing Arkansas, LLC Corporate Records.

advised the Arkansas Department of Environmental Quality that its ownership was changing because it was being acquired by Curry's newly-formed company, ATA.[28] That same day, Jumper wrote an unauthorized letter on the SSR letterhead to Amina Williams, a trust officer employed by Bank of America/Merrill Lynch, advising her that the Pension Plan was "purchasing a $3,000,000 senior promissory note issued by American Investments Fund I, LLC."[29] The letter states that AIF I recently acquired the assets of American Tubing, Inc., that "[w]e have performed extensive due diligence on this investment," and is signed "John S. Jumper, Vice President, Snow Shoe Refractories."[30]

As before, Jumper had no authorization to use SSR's letterhead, was not an authorized representative of the Pension Plan, and was not an employee of SSR.[31] Jumper never advised Merrill Lynch or any other authorized representative of SSR that it was taking $3 million from the Pension Plan and investing it in the promissory note issued by Curry's company.[32] He also never advised SSR that the AIF I

---

[28]   SUMF, Doc. 200 ¶17; Exhibit H—March 12, 2015 American Tubing Notice of Change of Ownership.

[29]   SUMF, Doc. 200 ¶18; Exhibit I—March 12, 2015 Letter to Merrill Lynch re: Purchase of $3,000,000 Senior Promissory Note, Doc. 200-9.

[30]   Exhibit I—March 12, 2015 Letter to Merrill Lynch re: Purchase of $3,000,000 Senior Promissory Note, Doc. 200-9.

[31]   SUMF, Doc. 200 ¶19; Blair Affidavit, Doc. 201-1 ¶12.

[32]   SUMF, Doc. 200 ¶20; Blair Affidavit, Doc. 201-1 ¶13. The Court infers that Blair, as Snow Shoe's principal and owner, now has personal knowledge of the financial transactions Jumper purported to engage in on Snow Shoe's behalf, following the revelation of Jumper's deceitful acts.

Promissory Note would not be held in a qualified pension plan account.[33] Jumper furnished Merrill Lynch with evidence of this "investment" in March 2015, sending a copy of the $3 million promissory note executed by AIF I on its behalf.[34] At this time, the Pension Plan was worth approximately $9.8 million.[35] Jumper instructed the Pension Plan's trustee, Merrill Lynch, to wire $3 million to AIF I on or about March 17, 2015, and it did so.[36]

In 2015, once AIF I had acquired ATA, it remitted payments of more than $1 million from ATA to Jumper's brokerage firm, Alluvion Securities, as a "fee" for arranging the ATA transaction.[37] Jumper was an owner of Alluvion Securities at this time, which was in "financial trouble" in 2015 and was siphoning funds from ATA to sustain itself.[38] Alluvion was ultimately charged with inadequate capitalization and fined $100,000 by the Financial Industry Regulatory Authority in 2015, and went out of business in 2016.[39]

---

[33]  SUMF, Doc. 200 ¶20; Blair Affidavit, Doc. 201-1 ¶13.
[34]  SUMF, Doc. 200 ¶22; Blair Affidavit, Doc. 201-1 ¶14; Exhibit J—March 17, 2015 $3 Million Promissory Note.
[35]  SUMF, Doc. 200 ¶23; Exhibit U—U.S. v. Jumper Indictment, Doc. 200-21 ¶15.
[36]  SUMF, Doc. 200 ¶24; Blair Affidavit, Doc. 201-1 ¶15.
[37]  SUMF, Doc. 200 ¶25; Exhibit U—U.S. v. Jumper Indictment, Doc. 200-21 ¶25; COP Transcript at 31.
[38]  SUMF, Doc. 200 ¶26; Exhibit U—U.S. v. Jumper Indictment, Doc. 200-21 ¶¶7-8; Exhibit K— FINRA Alluvion Violation Broker Report, Doc. 200-11.
[39]  SUMF, Doc. 200 ¶27; Exhibit K—FINRA Alluvion Violation Broker Report, Doc. 200-11.

### D.    Jumper's Fraudulent Withdrawal of $2,000,000 From the Plan

In November 2015, Jumper arranged for an additional $2,000,000 to be transferred from the Pension Plan to a new entity he had recently formed, known as American Investments Fund II ("AIF II").[40] AIF II was used to fraudulently transfer pension funds for the personal benefit of Jumper and other investors, and was used to siphon funds to business entities in which he owned interests: Arkansas Air Conditioning and Refrigeration, Elite Building Solutions, Speedee Brakes, Thousand Hills Capital, and Evertone Records.[41]

On November 20, 2015, Jumper sent two letters on SSR letterhead to Merrill Lynch, again without SSR's knowledge or permission, contending that the $2,000,000 was being transferred to a "separate trust," and that the funds were being vested in a promissory note issued by AIF II following "extensive due diligence."[42] Also on November 20, 2015, Jumper prepared a fraudulent document titled "Written Consent in Lieu of a Meeting for Snow Shoe Refractories, LLC," on SSR letterhead and without SSR's knowledge or permission, to convince Merrill Lynch that he was authorized to transfer the $2 million from the Pension Plan; Jumper forged Blair's

---

[40]    SUMF, Doc. 200 ¶28; Blair Affidavit, Doc. 201-1 ¶17.
[41]    SUMF, Doc. 200 ¶¶30-31; Exhibit U—U.S. v. Jumper Indictment, Doc. 200-21 ¶¶13-14, 35-39; COP Transcript at 32.
[42]    SUMF, Doc. 200 ¶¶32-33; Blair Affidavit, Doc. 201-1 ¶¶18-19; Exhibit L—November 20, 2015 Letter to Merrill Lynch re: $2 Million Transfer; Exhibit M—November 20, 2015 Letter to Merrill Lynch re: Funds Invested in Promissory Note, Doc. 200-13.

signature on the written consent.[43] Also on November 20, 2015, Metropolitan Bank sent a letter to Merrill Lynch stating that it had been appointed as the "custodian bank" with regard to the $2 million in transferred assets, which it believed to be true because of Jumper's fraudulent misrepresentations.[44]

### E.    Jumper's Fraudulent Withdrawal of $700,000 From the Plan

On February 18, 2016, Jumper sent Merrill Lynch a letter stating that the Pension Plan was investing $700,000 in another promissory note issued by AIF II, stating that Jumper had performed "extensive due diligence" on AIF II, and again containing a signature in which Jumper purported to be a Vice President of SSR.[45] As before, Jumper forged Blair's signature on a document titled "Unanimous Written Consent in Lieu of Meeting for Snow Shoe Refractories, LLC," purporting to authorize the $700,000 investment.[46] He also forged Blair's signature on a "Specimen Signature Document" provided to Merrill Lynch, which also falsely and fraudulently claimed that Jumper was SSR's Vice President.[47]

---

[43]  SUMF, Doc. 200 ¶¶35-36; Blair Affidavit, Doc. 201-1 ¶20-21; Exhibit N—November 20, 2015 Unanimous Written Consent in Lieu of a Meeting, Doc. 200-14.

[44]  SUMF, Doc. 200 ¶37; Blair Affidavit, Doc. 201-1 ¶¶22-23; Exhibit O—November 20, 2015 Metropolitan Bancgroup Letter to Merrill Lynch Stating Appointment as the custodian bank, Doc. 200-15; Exhibit U—U.S. v. Jumper Indictment, Doc. 200-21 ¶32.

[45]  SUMF, Doc. 200 ¶38; Blair Affidavit, Doc. 201-1 ¶24; Exhibit P—February 18, 2016 Letter to Merrill Lynch re: $700,000 Promissory Note Investment, Doc. 200-16.

[46]  SUMF, Doc. 200 ¶39; Blair Affidavit, Doc. 201-1 ¶25; Exhibit Q—February 18, 2016 Unanimous Written Consent in Lieu of Meeting, Doc. 200-17.

[47]  SUMF, Doc. 200 ¶40; Blair Affidavit, Doc. 201-1 ¶26; Exhibit R—February 18, 2016 Specimen Signature Document, Doc. 200-18.

On February 19, 2016, Jumper provided Merrill Lynch with a letter falsely claiming that SSR had "decided to remove" $700,000 from the trust,[48] and Merrill Lynch wire transferred $700,000 out of the Pension Plan account that same day.[49] Jumper sent the Pension Plan's outside actuaries at Conrad Siegel & Associates "Annual Statement(s) of Account" with respect to the two withdrawals on April 18, 2016.[50]

### F.    Jumper's Subsequent Indictment and SEC Lawsuit

Jumper was indicted by the United States Attorney for the Middle District of Pennsylvania in April 2018 for his activities involving the Pension Plan for four counts of wire fraud, embezzlement and theft from an employee benefit pension benefit plan, and false statement/concealment of facts in employee benefit plan records and reports.[51] Jumper pled guilty to Count I of the Indictment, "Wire Fraud Which Affects a Financial Institution," in April 2021.[52]

Count I of the indictment to which Jumper pled guilty states that "Jumper devised and intended to devise a scheme and artifice to defraud SSR Refractories,

---

[48]    SUMF, Doc. 200 ¶41; Blair Affidavit, Doc. 201-1 ¶27; Exhibit S—February 19, 2016 Letter to Merrill Lynch re: removal of $70,000, Doc. 200-19.

[49]    SUMF, Doc. 200 ¶42; Blair Affidavit, Doc. 201-1 ¶28.

[50]    SUMF, Doc. 200 ¶43; Blair Affidavit, Doc. 201-1 ¶29; Exhibit T—April 18, 2016 Annual Statement(s) of Account, Doc. 200-20.

[51]    SUMF, Doc. 200 ¶44; Exhibit U—U.S. v. Jumper Indictment, Doc. 200-21; Indictment, Doc. 1, *United States v. Jumper*, No. 4:18-CR-00128 (M.D. Pa. 2018).

[52]    SUMF, Doc. 200 ¶48; Order Granting Motion to Withdraw Plea of Not Guilty, Doc. 90, *United States v. Jumper*, No. 4:18-CR-00128 (M.D. Pa. 2018); *see also* Exhibit V—U.S. v. Jumper Judgment, Doc. 200-22.

LLC Hourly Employees Pension Plan ('the pension plan'), and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and said scheme did affect a financial institution."[53]  Count I also describes the fraudulent documents created by Jumper as identified in SSR's SUMF,[54] his fraudulent transfer of $3,000,000 from the pension funds,[55] the fraudulent transfer of $2,000,000 transfer of the pension funds,[56] the fraudulent transfer of the pension funds,[57] and Jumper's efforts to conceal and cover up the fraudulent pension transfers.[58]

The United States Securities and Exchange Commission also filed a lawsuit against Jumper in the United States District Court for the Western District of Tennessee in April 2018.[59] The SEC lawsuit alleged the same fraudulent activities as SSR alleges in its complaint, including "committing securities fraud by misappropriating approximately $5,700,000 from an employee pension plan" and using the funds for inappropriate ends.[60] The Western District of Tennessee issued a final judgment against Jumper in November 2018; it enjoined him from violating Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated

---

[53]  SUMF, Doc. 200 ¶46; Exhibit U—U.S. v. Jumper Indictment, Doc. 200-21, at 5.
[54]  Exhibit U—U.S. v. Jumper Indictment, Doc. 200-21, at 5-8.
[55]  *Id.* at 8-10.
[56]  *Id.* at 10-17.
[57]  *Id.* at 17-22.
[58]  *Id.* at 22-29.
[59]  SUMF, Doc. 200 ¶49; Exhibit W—SEC v. Jumper Complaint, Doc. 200-22; *SEC v. Jumper et al.*, No. 2:18-cv-02259 (W.D. Tenn. 2018).
[60]  Exhibit W—SEC v. Jumper Complaint, Doc. 200-22 ¶1.

thereunder; enjoined him from violating Section 17(a) of the Securities Act of 1933; and held him liable for disgorgement of $5,700,000.00, together with prejudgment interest in the amount of $726,758.79, representing profits gained as a result of the fraudulent conduct alleged in the complaint.[61]

## IV.    DISCUSSION

SSR seeks summary judgment against Jumper on its Breach of Fiduciary Duty (Count I), Conversion (Count II), and Unjust Enrichment (Count VI) claims. The undisputed facts entitle SSR to summary judgment on each of these claims.

### A.    Breach of Fiduciary Duty

Under the Employment Retirement Income Security Act ("ERISA"), "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate."[62] Count I of the Second Amended Complaint pleads a Breach of

---

[61] SUMF, Doc. 200 ¶50; Exhibit X—SEC v. Jumper Final Judgment, Doc. 200-24.
[62] 29 U.S.C. § 1109(a).

Fiduciary Duty claim pursuant to the private cause of action authorized under the Employment Retirement Income Security Act ("ERISA").[63]

Title 29 U.S.C. § 1106(a)(1)(D) prohibits an employee pension plan's fiduciary from causing the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect transfer to or use by or for the benefit of a party in interest, of any assets of the plan. A fiduciary is a party in interest.[64] A violation under § 1106(a)(1)(D) "occurs when (1) a fiduciary, (2) causes a plan to engage in a transaction, (3) that uses plan assets, (4) for the benefit of a party in interest, and (5) the fiduciary knows or should know that elements three and four are satisfied."[65]

"In every case charging breach of ERISA fiduciary duty . . . the threshold question is . . . whether that person was acting as a fiduciary (that is, performing a fiduciary function) when taking the action subject to complaint."[66] "Congress adopted a broad, functional definition of the term 'fudicary'" and "further intended

---

[63] The second amended complaint itself only cites to ERISA's fiduciary duty provisions in Count I and requests relief "in accordance with ERISA §502(g)(1)." Second Amended Complaint, Doc. 95 at 16-17. Snow Shoe's brief in opposition cites Pennsylvania state law regarding fiduciary duties as well as provisions of ERISA. Brief in Support, Doc. 199 at 305. Looking to the causes of action clearly implicated by the complaint, the Court limits its analysis to ERISA's breach of fiduciary duty cause action.

[64] 29 U.S.C. § 1002(14).

[65] *Sweda v. Univ. of Pa.*, 923 F.3d 320, 337 (3d Cir. 2019) (internal citations omitted).

[66] *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).

that the term fiduciary should not be defined solely by reference to a particular formal title such as trustee."[67]

"[A] person is a fiduciary with respect to a plan to the extent [] he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets."[68] Accordingly, fiduciary status under ERISA goes beyond those named as fiduciaries in the plan documents and extends to those who acted as *de facto* fiduciaries as described in the statute.[69] For a non-named fiduciary's actions to qualify as those of a *de facto* fiduciary, "the discretionary act must be undertaken with respect to plan management or administration" and be related to fiduciary functions in nature.[70] "Fiduciary functions include, for instance, 'the common transactions in dealing with a pool of assets: selecting investments, exchanging one instrument or asset for another, and so on.'"[71]

Jumper certainly was never a named fiduciary, but through the fraudulent instruments he used, he nevertheless purported to be one and deceived Merrill Lynch in doing so. The result was that Jumper actually exercised discretionary authority and control over the management and disposition of SSRPP's assets, directly

---

[67] *Galgay v. Gangloff*, 677 F.Supp. 295, 302 (M.D. Pa. 1987), *aff'd*, 932 F.2d 959 (3d Cir. 1991).
[68] 29 U.S.C. § 1002(21)(A).
[69] *Sec'y of Labor v. Doyle*, 675 F.3d 187, 200 (3d Cir. 2012); *Coulter v. Morgan Stanley & Co.*, 753 F.3d 361, 366 (2d Cir. 2014).
[70] *Coulter*, 753 F.3d at 367.
[71] *Id.* (quoting *Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 302 F.3d 18, 28 (2d Cir. 2002)).

selecting the "investments" in AIF I and AIF II he purported to make for the SSRPP. He therefore qualifies as a *de facto* fiduciary under Section 1002(21)(A) with respect to those investments.

Having established that Jumper was a fiduciary notwithstanding that his transactions were solely accomplished through forgery and fraud, the remaining elements of the breach of fiduciary duty claim are simple to resolve. Jumper caused the SSRPP to engage in several transactions using plan assets: the purchase of a $3,000,000 senior promissory note issued by AIF I, the transfer of $2,000,000 to AIF II and subsequent funneling of this money into other business entities owned by Curry and Jumper, and the subsequent $700,000 transferred to AIF II. These investments were for the benefit of Jumper, himself a party in interest due to his fiduciary status, because they transferred money to companies he held ownership interest in or owned outright (AIF I and AIF II).[72] And as Jumper's guilty plea demonstrates, he knew that he was using plan assets for his own benefit.

The Court also notes that alternative violations of ERISA provide a basis for finding breach of fiduciary duty here—for example, it is obvious that Jumper's "investments" were not discharged "for the exclusive purpose of [] providing benefits to participants and their beneficiaries; and [] defraying reasonable expenses

---

[72] *See* Exhibit U—U.S. v. Jumper Indictment, Doc. 200-21 ¶17 ("Jumper caused the unauthorized and fraudulent transfer of a total of $5.7 million in pension plan funds to AIF I and AIF II for the personal benefit of himself and other investors."); COP Transcript at 28, 32-35 (describing how Jumper used these funds to pay off personal debts).

of administering the plan; [] with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."[73] SSR cites other ERISA fiduciary violations in its briefing.[74] As the Court is satisfied that SSR prevails on its breach of fiduciary duty claims under this most obvious theory, however, it need not analyze the remaining four ERISA violations in depth here. The undisputed facts support SSR's breach of fiduciary duty claim under ERISA.

### B.    Conversion

Count II of the Second Amended Complaint pleads a conversion claim against Jumper under Pennsylvania state law. Conversion is "the deprivation of another's right of property in, or use or possession of, chattel, or other interference therewith, without the owner's consent and without lawful justification;"[75] a plaintiff can only

---

[73] 29 U.S.C. § 1104(a).

[74] Brief in Support, Doc. 199 at 4-5 ("failing to ensure that the assets of the Pension Plan were held in trust by one or more trustees, in violation of ERISA §403(a), 29 U.S.C. § 1103(a) . . . failing to diversify the investments of the Pension Plan in order to minimize the risk of large losses, in violation of ERISA § 404(a)(1)(C), 29 U.S.C. § 1104(a)(1)(C) . . . failing to be properly bonded in accordance with ERISA §412(a), 29 U.S.C. § 1112(a)").

[75] *Stevenson v. Economy Bank of Ambridge*, 197 A.2d 721, 726 (Pa. 1964).

bring a claim for conversion if it "had an immediate right to possession of the chattel at the time it was converted."[76] "Money may be the subject of conversion."[77]

"Specific intent is not required, however, but rather an intent to exercise dominion or control over the goods which is in fact inconsistent with the plaintiff's rights establishes the tort."[78] Therefore, where a defendant has "come rightfully into possession in the first instance," "a demand and refusal is an essential element of an action for conversion."[79] In contrast, where a defendant "has no prior right to th[e] money," obtaining the chattel is itself an act of "unreasonably withholding possession from one who has the right to it," is inconsistent with the plaintiff's rights, and qualifies as a conversion absent a demand and a refusal.[80]

Here, Jumper deprived the SSRPP of its immediate right to possession of property, specifically in $5,700,00.00 in pension funds, through a series of fraudulent documents and misrepresentations falsely claiming that he was SSR's vice president and trustee. As Jumper intentionally engaged in such fraudulent acts and was never an SSR employee or officer, he siphoned these funds without consent or lawful justification, and for his personal use. And although there is no allegation

---

[76] *Spector Gadon & Rosen, P.C. v. Rudinski, Orso & Lynch*, 231 A.3d 923, 925 (Pa. Super. Ct. 2020) (quoting *Bank of Landisburg v. Burruss*, 524 A.2d 896, 898 (Pa. Super. 1987)).

[77] *Id.* However, conversion claims for such non-tangible property are more difficult to measure. For instance, failure to pay debt does not qualify as conversion. *See Leonard A. Feinberg, Inc. v. Central Asia Capital Corp., Ltd.*, 974 F.Supp. 822, 845 (E.D. Pa. 1997).

[78] *Shonberger v. Oswell*, 530 A.2d 112, 114 (Pa. Super. Ct. 1987) (citing *Stevenson*, 197 A.2d at 726).

[79] *Norriton E. Realty Corp. v. Central-Penn Nat. Bank*, 254 A.2d 637, 638 (Pa. 1969).

[80] *Martin v. Nat'l Sur. Corp.*, 262 A.2d 672, 164-65 (Pa. 1970).

that SSR demanded these funds back, this was not a necessary element of the conversion claim because Jumper had no right to the money in the first place. Accordingly, the undisputed facts satisfy the elements of conversion.

### C.    Unjust Enrichment

Count VI of the second amended complaint pleads an unjust enrichment claim against Jumper. Unjust enrichment is an equitable doctrine sounding in contract.[81] "Where unjust enrichment is found, the law implies a contract . . . which requires that the defendant pay to plaintiff the value of the benefit conferred. In short, the defendant makes restitution to the plaintiff in *quantum meruit*."[82] An unjust enrichment claim must show "[1] benefits conferred on defendant by plaintiff, [2] appreciation of such benefits by defendant, and [3] acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value."[83]

Jumper was arguably never "conferred" any benefits by SSR because he stole them all through his fraudulent acts rather than through any agreement. But Jumper did hold himself out to be SSRPP's fiduciary and make investments on its behalf. Moreover, unjust enrichment is not so rigidly defined. Although it is "typical" for unjust enrichment claims to provide recovery "from defendant for a benefit

---

[81]  *Temp. Univ. Hosp., Inc. v. Healthcare Mgmt. Alternatives, Inc.*, 832 A.2d 501, 508 (Pa. Super. 2003).

[82]  *Schenck v. K.E. David, Ltd.*, 666 A.2d 327, 328-29 (Pa. Super. Ct. 1995).

[83]  *Lackner v. Glosser*, 892 A.2d 21, 34 (Pa. Super. Ct. 2006) (quotation omitted).

conferred under an unconsummated or void contract,"[84] "[a] quasi-contract imposes a duty, not as a result of any agreement, whether express or implied, but in spite of the absence of an agreement, when one party received unjust enrichment at the expense of another."[85] "In determining if the doctrine applies, we focus not on the intention of the parties, but rather on whether the defendant has been unjustly enriched . . . the most significant element of the doctrine is whether the enrichment of the defendant is unjust.[86]

"Pennsylvania has adopted the [Third] Restatement of Restitution for determining whether there is unjust enrichment."[87] According to the Restatement: "A transfer induced by fraud or material representation is subject to rescission and restitution. The transferee is liable in restitution as necessary to avoid unjust enrichment."[88] "A person who obtains a benefit by misappropriating financial assets, or in consequence of their misappropriation by another, is liable in restitution to the victim of the wrong."[89]

Here, when Jumper transferred funds from the SSRPP to AIF I and AIF II, he induced the corporate entity of SSR—through fraud—to transfer SSRPP's assets for

---

[84]   *Boring v. Google Inc.*, 362 F.App'x 273, 281 (3d Cir. 2010).
[85]   *Stoeckinger v. Presidential Financial Corp. of Delaware Valley*, 948 A.2d 828, 833 (Pa. Super. 2008).
[86]   *Id.*
[87]   *Mifflinburg Tel., Inc. v. Criswell*, 277 F.Supp. 3d 750, 802 (M.D. Pa. 2017) (citing *D.A. Hill Co. v. Clevetrust Realty Inv'rs*, 573 A.2d 1005, 1009 (Pa. 1990)).
[88]   RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 13 (AM. L. INST. 2011).
[89]   *Id.* § 41.

his own personal gain, and it would be inequitable for Jumper to retain the benefit of such transfers without payment of value. Accordingly, Jumper is liable in restitution to SSR for unjust enrichment.[90] Accordingly, SSR has adequately supported its motion for summary judgment on its unjust enrichment claim against SSR.

## V.    DAMAGES

The Court can take judicial notice of the facts to which Jumper pled guilty in the criminal matter, including the theft of $5,700,000 in assets from the SSRPP.[91] But SSR raises several other damages issues which the Court has insufficient evidence to resolve at this time, including the offsetting settlement amounts from other defendants in this matter, costs of recovery, and attorney's fees.[92] SSR's complaint also requests other forms of damages, including "any profits or other valuable benefit made or received by Jumper through the use of the Pension Plan's assets,"[93] "income and gains that the Pension Plan would have earned but for Jumper's wrongful embezzlement, theft and conversion of its assets,"[94] and

---

[90]   Alternatively, "an unjust enrichment claim may be pled as a companion . . . to a claim of unlawful or improper conduct as defined by law—e.g., a tort claim." *Whitaker v. Herr Foods, Inc.*, 198 F.Supp. 3d 476, 493 (E.D. Pa. 2016). Accordingly, SSR's unjust enrichment claim would survive because its conversion claim does.

[91]   *See* COP Transcript at 34.

[92]   Brief in Support, Doc. 199 at 1.

[93]   Second Amended Complaint, Doc. 95 at 16.

[94]   *Id.* at 17.

"imposition of a constructive trust on Jumper's assets and income."[95] SSR states in its brief in support that it will "submit evidence of the damages, attorney's fees, costs, and pre- and post-judgment interest, and offsetting settlement amounts from other defendants in this matter" in "an amount to be determined at a later date."[96] Accordingly, the Court will provide SSR with 30 days from the date of the Order that accompanies this Memorandum Opinion to do so.

I also provide SSR with brief guidance regarding the attorney's fees issue in this case. With respect to attorney's fees, ERISA provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."[97] In the Third Circuit, ERISA plaintiffs seeking attorney's fees must first show that they have achieved "some degree of success on the merits,"[98] which is not at issue here. Second, district courts must consider the five factors set forth in *Ursic v. Bethlehem Mines*: "(1) the offending parties' culpability or bad faith; (2) the ability of the offending parties to satisfy an award of attorneys' fees; (3) the deter[r]ent effect of an award of attorneys' fees; (4) the benefit conferred on the members of the pension plan as a whole; and (5) the relative merits of the parties' position."[99] The

---

[95] *Id.* at 20-21. SSR should indicate to the Court if it believes a hearing is necessary to resolve any damages issues.
[96] Brief in Support, Doc. 199 at 1.
[97] 29 U.S.C. § 1132(g)(1).
[98] *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 255 (2010).
[99] 719 F.2d 670, 673 (3d Cir. 1983).

Court is "required to consider each of the *Ursic* factors."[100] SSR must prevail under this test to obtain attorney's fees under ERISA.[101]

Once the Court has determined that an ERISA plaintiff is entitled to attorney's fees, Courts apply the "lodestar" formula to determine a reasonable award. "Under the lodestar method, an[] attorney's reasonable hourly rate is multiplied by the number of hours the attorney reasonably spent working on a matter."[102] "Once the court determines the reasonable hourly rate, it multiples that rate by the reasonable hours expended to obtain the lodestar."[103] "The lodestar is presumed to be the reasonable fee."[104] When completing this analysis, I am to go "line-by-line" through the billing statement and must conduct "a thorough and searching analysis."[105]

The prevailing party bears an initial burden of "producing sufficient evidence of what constitutes a market rate."[106] "A reasonable market rate is established with reference to the community billing rate charged by attorneys of equivalent skill and experience performing work of similar complexity."[107] "An attorney's usual billing rate is a good starting point for assessing reasonableness, though it is not

---

[100] *Templin v. Independence Blue Cross*, 785 F.3d 861, 868 (3d Cir. 2015).

[101] If SSR seeks attorney's fees based on its conversion or unjust enrichment claims, it should provide authority explaining why those causes of action entitle it to attorney's fees.

[102] *D.O. ex rel. M.O. v. Jackson Twp. Bd. of Educ.*, No. CV 17-1581 (TJB), 2019 U.S. Dist. LEXIS 72875, at *2 (D.N.J. Apr. 30, 2019).

[103] *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990).

[104] *Id.*

[105] *Interfaith Cmty., Org. v. Honeywell Int'l, Inc.*, 426 F.3d 694, 703 n.5 (3d Cir. 2005).

[106] *Carey v. City of Wilkes-Barre*, 496 F.App'x 234, 236 (3d Cir. 2012) (quoting *Evans v. Port Auth. of N.Y.*, 273 F.3d 346, 361 (3d Cir. 2001)).

[107] *Carey*, 496 F.App'x at 236 (internal quotations removed).

dispositive."[108] Establishing a reasonable market rate requires evidence beyond affidavits from the plaintiff's own attorneys;[109] this "evidence often comes in the form of affidavits from other attorneys."[110] I am also to consider "the relative simplicity of the case, the quality of moving counsel's papers, and my 'perception of counsel's skill and experience during the [litigation].'"[111] The Court must also evaluate the evidence supporting the hours claimed. Typically, the prevailing party can meet its burden through the submission of detailed time records. [112]

"If the plaintiff fails to meet her prima facie case, the district court has the discretion to determine what award is reasonable."[113]

## VI.    CONCLUSION

SSR is entitled to summary judgment on its breach of fiduciary duty, conversion, and unjust enrichment claims against Jumper.

An appropriate Order follows.

BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge

---

[108] *Potence v. Hazleton Area Sch. Dist.*, 357 F.3d 366, 374 (3d Cir. 2004).

[109] *Souryavong v. Lackawanna Cnty.*, 159 F.Supp. 3d 514, 525 (M.D. Pa. 2016).

[110] *Carey*, 496 F.App'x at 236.

[111] *Gillespie v. Dring*, No. 3:15-CV-00950, 2019 U.S. Dist. LEXIS 180019, at *29 (M.D. Pa. Oct. 17, 2019) (quoting *Mantz v. Steven Singer Jewelers*, 100 F.App'x 78, 81-82 (3d Cir. 2004)).

[112] For a recent decision of this Court analyzing the attorney's fees issues in depth, *see Holmes v. Am. HomePatient, Inc.*, No. 4:21-CV-01683, 2025 U.S. Dist. LEXIS 14627 (M.D. Pa. Jan. 28, 2025).

[113] *Carey*, 496 F.App'x at 237.